Filed 7/21/15  P. v. Widomen CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SHAWN C. WIDOMEN,<br><br>Defendant and Appellant. | A139890<br><br>(Contra Costa County<br> Super. Ct. No. 5-131092-9) |

A jury found defendant Shawn C. Widomen guilty of the felony offenses of inflicting corporal injury resulting in a traumatic condition on a cohabitant (the victim) (Pen. Code, § 273.5, subd. (a)) (count one)[1] and assault by means of force likely to produce great bodily injury on the victim (§ 245, subd. (a)(1)) (count two).  The court sentenced defendant to an aggregate term of four years in state prison, consisting of an upper term of four years imposed on count one, and an upper term of four years imposed on count two, which was stayed pursuant to section 654.  Defendant argues the trial court committed prejudicial error by refusing his request to give a pinpoint jury instruction on the defense of accident (CALCRIM No. 3404).  We disagree, and accordingly, affirm.

---

[1]     All further unspecified statutory references are to the Penal Code.

# FACTUAL AND PROCEDURAL BACKGROUND[2]

The charges against defendant arose out of an incident that occurred on November 1, 2012. The prosecution and the defense presented diametrically different accounts of the incident at a trial held in August 2013.

## A.    Prosecution's Case

Defendant and the victim lived together in an apartment complex. In the early afternoon of November 1, 2012, the victim's mother, Victoria,[3] drove to the complex to visit the victim.[4] Victoria arrived at the complex and parked her car in the driveway. Defendant came out of the apartment to greet her. Victoria asked him where the victim was and defendant said he would go and get her. While she was waiting, Victoria heard screaming and yelling coming from inside the apartment shared by defendant and the victim. According to Victoria, the victim sounded angry and scared, and defendant sounded angry. Victoria heard the victim yell, "Leave me alone," or "Let me go."

A couple of minutes later, Victoria saw defendant pulling the victim by her hair and down the outside concrete stairs that lead from the front entrance of the apartment to the ground. The victim looked scared and yelled and screamed as she struggled to push away from defendant. Victoria then heard the victim say, "Look what you've done. You've bitten my ear."[5] Defendant pulled the victim's hair and punched her. The victim fell to the ground and rolled up into a fetal position to avoid the attack. While the victim was on the ground, defendant repeatedly kicked the victim five or six times on her side.

---

[2]    We set forth only those relevant facts necessary to resolve this appeal.

[3]    Because the victim and her mother share the same surname, we shall refer to the victim's mother as Victoria.

[4]    The jury was shown a diagram drawn by Victoria, which showed the location of the apartment shared by defendant and the victim, the stairs outside the front entrance, and the driveway where she parked her car. Victoria testified that the outside stairs were not a covered stairwell, but a low-rise staircase that allowed a person to see somebody walking down those stairs. Her car was parked about 14 to 15 feet away from the stairs.

[5]    Later at the hospital, Victoria saw that the victim had definitely been bitten on the earlobe.

The victim covered her face with her arms, and she was screaming, crying, and yelling, "Leave me alone." Victoria made these observations while looking out of the window of her car.

Defendant's physical assault on the victim lasted approximately five minutes, and then he went back into the apartment. When defendant left, Victoria asked defendant's father to help her get the victim into the car.[6] Once the victim was in the car, Victoria rolled up the car windows and locked the doors. Defendant returned with a backpack. He punched the car window, leaving a bloody handprint on the window, and then he threw rocks at the car. In response to defendant's actions, Victoria drove her car several blocks away. Victoria also called 911 several times: first when defendant was assaulting the victim outside the car, and a second and third time after she had driven away with her daughter. The jury heard a recording of one 911 call, which had been placed while Victoria and the victim were in Victoria's car. When the police arrived, both the victim and her mother were emotional and hysterical. Victoria took her daughter to the hospital. They were there for approximately 45 minutes and then the victim was discharged.[7]

At the trial the victim initially testified that she remembered nothing about November 1, 2012 other than the fact that she was drunk because she knew she drank every day. On further questioning, she recalled being at the hospital that day and leaving

---

[6]     Victoria testified that defendant's father was standing outside and saw defendant's assault on the victim. Neither party called defendant's father as a witness at the trial.

[7]     A redacted copy of the hospital medical report was admitted into evidence. The victim complained of "laceration above right eye, swollen nose, and laceration to left eye," and "current headache." A medical examination found that the victim had sustained a head injury consisting of "1cm laceration lateral to R eye with no orbital injury. L ear with . . . [broken] . . . skin superficially for 2cm posteriorly. Very mild auricular hematoma anteriorly. No cartilage involvement." There were "multiple superficial abrasions across chest," but no "tenderness." In the mouth and throat area, there was "no swelling, exudate or inflam[m]ation, no malocclusion, no oral lacerations." The victim was diagnosed as sustaining a "closed head injury," "laceration on face," "open wound external ear," and "hematoma of auricle." The l cm laceration above her right eye was irrigated and closed with Dermabond skin adhesive. The ear wound was bandaged and a compression dressing was put on the ear to prevent hematoma formation. An antibiotic was prescribed for the ear wound to prevent infection.

3

because she wanted a cigarette. She did not have any sutures or broken bones, and she did not have any follow-up with a doctor. The victim recalled that she had sustained two black eyes, but no other injuries. She did not think she had a bite mark on her ear. When asked how she got her injuries, the victim testified that she did not remember what happened but she recalled that the day before she had been with her mother and then she woke up the next morning with the injuries. She did not recall defendant assaulting her. When asked if she recalled falling into the car, she replied, "No. I never even heard that part before." She did not recall falling on the ground. Nor did she recall telling the police that defendant had assaulted her or even seeing the police. She attributed her poor memory to alcohol abuse.

City of Richmond Police Officer Robert Branch testified that he had responded to a call of an assault on the afternoon of November 1, 2012. He met with the victim and her mother Victoria at a location about two blocks from the victim's apartment. The victim was "visibly upset," "shaking and tearful and crying." Officer Branch observed that the victim had a large lump above her left eye, a cut near her right eye, a large scratch that started near her left shoulder and went kind of downward across her chest, swollen and bloody lips, and blood running down her face. The officer also observed a mark on the victim's ear, which was consistent with the victim's statement that she had a bite mark on her left ear.[8] The victim informed the officer that she had been assaulted by defendant. The officer smelled alcohol on the victim, who admitted that she had been drinking all day, was intoxicated, and had a hard time remembering things. However, the officer opined that the victim was able to understand his questions and she was clear that defendant had inflicted the observed injuries. The officer asked the victim if she knew where defendant was and the victim responded that defendant was at their apartment. Approximately 10 minutes later, Officer Branch contacted defendant who was found

---

[8]     The court partially sustained an objection to the reference to a bite mark, advising the jury that the testimony was being allowed not for the truth of what was stated by the victim, but to explain the actions that were taken by the officer after he heard the statement.

4

riding his bicycle. Defendant did not appear to have any injuries on him. The officer later spoke with the victim at the hospital. The victim recounted that she and defendant had gotten into an argument. Defendant punched her, hit her in the face and mouth several times, and bit her ear. Defendant dragged the victim outside and the victim was ultimately able to get away with her mother. The victim declined any assistance, and said that she did not want to press charges against defendant and she did not want him to go to jail.

### B. Defense Case

Defendant testified as part of the defense case. He stated that on the day of the incident the victim was intoxicated, having drank about "a quarter of a 1.75" during the morning. At about 4:00 p.m., defendant's father told the victim that her mother was sitting in her car outside of their apartment. The victim walked down a staircase inside the apartment using a hand railing because she was "a little wobbly." Because there was no hand railing for the outside concrete stairs leading to the ground, defendant insisted on helping the victim walk down those stairs by holding the victim around her waist.[9]

Defendant further testified that he did not assault or punch, kick, or bite the victim. He only assisted the victim in walking her toward her mother's car by placing his arm around her waist. As defendant and the victim approached her mother's car, the victim said, "No, no. Not in front of my mother," and turned around and attempted to push away from defendant, who was still holding the victim's waist. When the victim pushed off against defendant, "it started to look like a struggle," so he released her. The victim then "stumbled forward," hit the car, went down, and started to cry and was in hysterics. Defendant ran over to the victim and sought to help her, but she was tucked in front of the front wheel and the bumper of the car. The victim yelled to defendant to get away from her. She was "kind of flailing about" with her feet, but she was not kicking in defendant's direction. Defendant repeated his request to assist the victim and she said

---

[9] According to defendant, while he was assisting the victim down the outside concrete stairs, Victoria could not see them because of the car's location and her position in the driver's seat.

no.[10]  At some point defendant's father came outside, and said he would help the victim and told defendant to go back to the apartment.  Defendant complied.

Defendant believed the victim sustained her injuries when she fell into the front corner of the car bumper and hit her head on the side of the car door.  He testified that the victim had been wearing an earring during the incident, and the skin on her left ear was broken a little bit.  He did not observe that the victim had swollen lips or a swollen nose.  Nor did he see any type of swelling or laceration around either of the victim's eyes.  He did observe that she had "a little color" and a "little puffiness" on her right eye, and her left eye was blackened.

## DISCUSSION

### Trial Court's Refusal to Give Requested Pinpoint Instruction on Defense of Accident Was Not Prejudicial Error

Defendant argues the trial court committed prejudicial error by refusing to give a requested pinpoint instruction on the defense of accident.  As we now discuss, we conclude defendant's argument is without merit.

### A.  Relevant Facts

During a jury instruction conference, defense counsel asked the court to give a pinpoint instruction on the defense of accident using language in CALCRIM No. 3404.[11]  The court refused on the ground that the evidence was "quite simply insubstantial" on the issue.  According to the court, "the only act that the defendant is relying on is the letting

---

[10]  According to defendant, Victoria could not see what was happening to victim on the ground because Victoria was seated in the car.  Only if Victoria had her neck out the car window could she have seen the victim on the ground.  Defendant initially testified that the car window was not open and Victoria definitely did not have her neck out the car window.  He later conceded that because he was trying to help the victim, he did not know if the car window was open or if Victoria had her neck out the car window.

[11]  The concept of accident as applied to general or special intent crimes is outlined in CALCRIM No. 3404 in the following manner:  "The defendant is not guilty of ___ <insert crime(s)> if (he/she) acted [or failed to act] without the intent required for that crime, but acted instead accidentally.  You may not find the defendant guilty of ____ <insert crime(s)> unless you are convinced beyond a reasonable doubt that (he/she) acted with the required intent."

go of the victim when she asked to be released from his custody, he did that voluntarily, not by accident. . . ." Objecting to the ruling, defense counsel argued, "about the accident instruction[,]. . . the instruction also covers . . . acts or omissions on the part of Mr. Widomen. I think the way the testimony came out, you know, she pushed off on him and he let go, and then she fell and hit her head on the car or the bumper of the car. I would argue that that omission is an act that could, you know, . . . it could be argued both ways, that by him not acting, he could have purposely let her go and she fell or it was an accident when . . . she pushed off and she didn't want him to touch her and he obliged, but that her falling, the consequence of that, was an accident. And the injury itself was an accident . . . [and] a consequence of the fall was part of an accident." The court replied, "I think that the . . . accidental injury . . . could be the subject of argument; that is to say, it might be argued, for instance, by you that the injuries to her head resulted from a fall, that therefore it's not attributable to a punch or a kick or whatever. But I still see the accident that this instruction is intended to reach is something that your client did by accident and he did not do that by accident. So I draw the line at that point."

### B. Analysis

"Penal Code section 26 states the statutory defense: 'All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Five – Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence.' The defense appears in CALCRIM No. 3404, which explains a defendant is not guilty of a charged crime if he or she acted, 'without the intent required for that crime, but acted instead accidentally.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 996 (*Anderson*).) "A trial court's responsibility to instruct on accident therefore generally extends no further than the obligation to provide, *upon request*, a pinpoint instruction relating the evidence to the mental element required for the charged crime." (*Id*. at p. 997.) Additionally, "[a] trial court must give a pinpoint instruction, even when requested, only if it is supported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 39 [61 Cal.Rptr.2d 84, 931 P.2d 262].)" (*People v. Ward* (2005) 36 Cal.4th 186, 214-215.) " 'In determining

7

whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt." ' " (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)

Defendant argues that an accident instruction was required in this case because his testimony constituted substantial evidence from which the jury could find that when he voluntarily released the victim he did not intend to injure her. However, "[t]he accident defense is a claim that the defendant acted without forming the mental state necessary to make his actions a crime." (*People v. Gonzales* (1999) 74 Cal.App.4th 382, 390 (*Gonzales*), disapproved on another point in *Anderson, supra*, 51 Cal.4th at p. 998, fn. 3.) In determining whether defendant was guilty of the charged crimes, the jury was required only to find that defendant's acts were done willingly or on purpose; there was no requirement of a finding that defendant acted with "the specific intent" to injure the victim. (*People v. Thurston* (1999) 71 Cal.App.4th 1050, 1053-1054 [describing mental state element for violation of § 273.5, subd. (a)]; see *People v. Leonard* (2014) 228 Cal.App.4th 465, 486 [describing mental state element for violation of § 245, subd. (a)].) Here, defendant testified that he intentionally held the victim by her waist and then released her at her request. She thereafter stumbled, hit the car, and then fell to the ground. Thus, under defendant's version, he did not claim he accidentally caused the victim to fall. And, his act of intentionally releasing the victim does not support the requested accident instruction. (Cf. *Gonzales, supra*, 74 Cal.App.4th at pp. 385-386, 390 [accident instruction warranted where there was defense evidence that the victim had testified at preliminary hearing that "[her] injuries were caused by an accident" when she was struck by the bathroom door as she was leaving the bathroom and defendant was entering the room].)

Even assuming the trial court should have given an accident instruction in this case, we conclude defendant has failed to demonstrate prejudicial error. In evaluating the impact of the trial court's refusal to give a pinpoint instruction on accident, we consider "the entire cause including the evidence," defense counsel's focus in closing argument on

8

the evidence supporting the defense theory, and whether any given instructions would have precluded the jury "from giving that evidence its due weight." (*People v. Wharton* (1991) 53 Cal.3d 522, 571-572 [failure to give requested pinpoint instruction on defense theory of provocation found harmless as given instructions did not preclude jury from finding provocation and defense counsel's closing argument pinpointed defense theory and supporting evidence]; see *People v. Earp* (1999) 20 Cal.4th 826, 887 [failure to give requested pinpoint instruction on defense theory of third-party perpetrator found harmless as given instructions included prosecution's burden of proof and defense counsel's argument pinpointed defense theory and supporting evidence].)

In this case, the jury was asked to consider "two radically different interpretations of the facts." The prosecution theory was that the victim had sustained her injuries by defendant's distinct acts (pulling hair, dragging down the stairs, biting, punching) before the victim fell to the ground and defendant's distinct acts (kicking the victim) after she fell to the ground. The defense theory was two-fold: (1) the victim's mother was not a credible witness and the medical report did not support the injuries described by the victim's mother and the police officer who responded to the 911 call, and (2) defendant's testimony ─ that he had not physically assaulted or inflicted injury on the victim and the victim likely incurred her injuries solely as a consequence of her own conduct ─ was more credible and supported by the medical report. We see nothing in the instructions given to the jurors that precluded them from considering defendant's theory of the circumstances of the incident and how the victim sustained her injuries. Although the jurors were not directly instructed that they had to find that defendant did not act "accidentally," the jurors were told that in order to convict defendant of any crime, they had to find he had committed "an act willfully," in that he did it "willingly or on purpose." The jurors were further advised that they had to find that defendant not only committed a prohibited act but that he did so with wrongful intent in that he intentionally did a prohibited act. By finding the defendant guilty, the jurors necessarily found that defendant act "willingly or on purpose," and necessarily rejected the defense theory and evidence that would have supported a contrary finding, "thus implicitly resolving the

question" of defendant's mental state "adversely to defendant." (*People v. Jones* (1991) 234 Cal.App.3d 1303, 1315-1316 (*Jones*), disapproved on another ground in *Anderson, supra*, 51 Cal.4th at p. 998, fn. 3; see *Jones, supra*, at pp. 1314-1315, fn. 9 ["the 'necessarily decided under other proper instructions' exception to reversibility" is applicable to omitted instructions on defenses, "which in large part, merely serve to negate the existence of one or more of the elements of the charged offenses"].) Based on this record, we therefore find that it is neither "reasonably possible" that the omitted accident instruction might have materially influenced the jury in arriving at its verdict (*Chapman v. California* (1967) 386 U.S. 18, 24), nor "reasonably probable" that defendant would have obtained a more favorable outcome had the omitted accident instruction been given (*People v. Watson* (1956) 46 Cal.2d 818, 836). [12]

## DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

---

[12] We are not persuaded by defendant's argument that *People v. Acosta* (1955) 45 Cal.2d 538, "illustrates how a reviewing court should analyze the trial court's refusal to give an 'accident' instruction," and is "controlling precedent." The case is factually inapposite to this case (*id.* at pp. 543-544), and in all events, does not support reversal of defendant's conviction.